USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   5/12/11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
VASILIY ERMICHINE,                              :        REPORT AND
                                                :        RECOMMENDATION
                        Petitioner.             :
                                                :        06 Civ. 10208 (LAP) (JLC)
        -v.-                                    :
                                                :        (Non-ECF Case)
UNITED STATES OF AMERICA,                       :
                                                :
                        Respondent.             :
-------------------------------------------------------------X

**JAMES L. COTT, United States Magistrate Judge.**

**To The Honorable Loretta A. Preska, Chief United States District Judge:**

I.      **INTRODUCTION**

        On October 23, 2006, Petitioner Vasiliy Ermichine ("Petitioner" or "Ermichine") filed a

"Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence By A Person in

Federal Custody," challenging his December 5, 2001 conviction in this Court.  Petition (the

"Petition" or "Pet.") (Doc. No. 1).   After a jury trial, Ermichine was convicted of two counts of

racketeering, and one count each of kidnapping in aid of racketeering, murder in aid of

racketeering, and conspiracy to kidnap, for which he was sentenced to concurrent terms of life

imprisonment.  Id.  Ermichine contends in the Petition that the trial court violated his Sixth

Amendment right to trial counsel by denying him the attorney of his choice, and that trial

counsel was ineffective for failing to challenge the "multiplicitous nature" of the indictment.

Pet. at 5-6.

        On September 25, 2009, Ermichine filed a motion to amend the Petition based on

allegedly newly discovered evidence.  (Doc. No. 6).  Specifically, Ermichine argues that the

testimony of Natan Gozman ("Gozman"), one of his co-defendants, in subsequent proceedings in

1

USDC SDNY
DATE SCANNED   5/12/11

this Court and in state court casts doubt upon the circumstances surrounding the murder and kidnapping of Sergei Kobozev ("Kobozev"), for which Ermichine was convicted.  For the reasons set forth below, I recommend that both motions be DENIED.

## II.    FACTUAL BACKGROUND

Ermichine and co-defendant Alexander Nosov ("Nosov") were tried before the Honorable Robert L. Carter under Docket No. 00 Cr. 314 (RLC).  The trial began on November 14, 2001, and concluded with a jury verdict on December 5, 2001.  At trial, the Government presented several witnesses, including cooperating witness Alexander Spitchenko ("Spitchenko").  Ermichine presented a single witness, Special Agent Kevin O'Donnell.  The evidence at trial revealed the following:

### A.  The Crimes

In June 1995, the Government arrested several members of a Russian organized crime group known as Ivankov's Brigade.  Trial Transcript Volume II ("Trial Tr. Vol. II"): Alexander Spitchenko ("Spitchenko") at 236:25-237:6.  Ermichine and Spitchenko were members of Ivankov's Brigade, but were not included in the arrest.  Id. at 228:23-229:18, 230:7-231:2, 237:23-24.  After the arrest, three members of Ivankov's Brigade—Spitchenko, Ermichine, and Igor Tatarin ("Tatarin")—decided to form their own organized crime group, which came to be known as "Tatarin's Brigade," or, simply, the "Brigade."  Id. at 198:17-199:5, 238:16-18.  Spitchenko and Ermichine were second-in-command of the Brigade.  Id. at 199:1-3, 238:21-239:2.  Ermichine's friends, Nosov and Gozman, soon joined the Brigade.  Id. at 239:9-240:12.  Like its predecessor, the Brigade engaged in extortion, hostage-taking, robbery, murder, and other illegal activity.  Id. at 199:8-18, 200:13-21: Trial Transcript Volume III ("Trial Tr. III"): Spitchenko at 247:16-22, 271:1-19.

2

In early November, 1995, Nosov was a patron at the Paradise Restaurant (the "Paradise"), a nightclub in Brooklyn where Kobozev worked as a bouncer. Trial Transcript Volume I ("Trial Tr. I"): Philip Balzano ("Balzano") at 35:25-37:20. Id.: Valera Zimnovitch at 49:1-5. That evening, a fight ensued between Nosov and the club's lead musician after the band refused to perform a song at Nosov's request. Id.: Balzano at 35:25-38:14, 42:3-8; Trial Tr. II: Spitchenko at 279:24-280:16. The fight resulted in Kobozev, club owner Valera Zimnovitch ("Zimnovitch"), and a third man, Igor Grafman ("Grafman"), confronting Nosov in an office inside the club, where they humiliated Nosov and threatened him with a gun. Trial Tr. I: Balzano at 52:22-53:24, 54:2-25; Id.: Zimnovich at 53:2-55:11; Trial Tr. III: Spitchenko at 280:10-281:11.

After the event at the Paradise, Nosov, Ermichine, Gozman, Tatarin, and Spitchenko decided to retaliate against Grafman and Zimnovitch in an effort to "increase the authority" of the Brigade. Trial Tr. III: Spitchenko at 281:3-283:12. A few days later, on November 8, 1995, Ermichine, Nosov, and Gozman spotted Kobozev at the Midwood Auto Center, an auto body shop in Brooklyn. Trial Tr. I: Nakhman Gluzman ("Gluzman") at 124:11-125:126:12. Ermichine approached Kobozev and led him into the shop's stockroom, where Nosov and Gozman waited. Id.: Gluzman at 126:13-127:11. Inside the stockroom, a fight ensued and ended with Nosov shooting Kobozev in the back. Trial Tr. III: Spitchenko at 294:5-10, 296:23-297:3.

Five minutes later, Nosov and Gozman walked a wounded Kobozev out of the shop, and put him in the back seat of their car, a Jeep Cherokee. Trial Tr. I: Gluzman at 127:15-21, 128:16-129:14. Several minutes later, Ermichine emerged from the stockroom, got inside

Kobozev's car, and followed Nosov and Gozman to Spitchenko's home in Livingston, New Jersey. Gluzman at 129:15-130:2.

Upon arriving in Livingston, Ermichine told Spitchenko that he, Nosov, and Gozman had killed one of the men from the confrontation at the Paradise, and that they wanted to bury the body in Spitchenko's backyard. Trial Tr. III: Spitchenko at 284:3-11. With Spitchenko's permission, Ermichine, Nosov, and Gozman buried Kobozev's body in a shallow grave behind a pool in the backyard. Trial Tr. II: Spitchenko at 200:7-12; Trial Tr. III: Spitchenko at 283:22-285:18. After burying the body, the men asked Spitchenko for paper towels and cleaning fluid to clean the inside of the Jeep Cherokee. Trial Tr. III: Spitchenko at 289:13-290:4. The men disposed of Kobozev's belongings in garbage receptacles in different neighboring towns. Id. at 293:21-294:4.

After burying the body, Nosov, Ermichine, and Gozman told Spitchenko about the shooting at the Midwood Auto Center, including that Kobozev had been alive during the drive to New Jersey and that he had pleaded to be taken to a hospital. Id. at 290:23-294:15. When Spitchenko told the men that he thought Kobozev might still be alive, Ermichine responded that he had broken Kobozev's neck at Spitchenko's home, just before burying the body. Id. at 292:8-293:8-10.

The next day, Ermichine, Nosov, Gozman, and Spitchenko met with Tatarin and told him that they had killed Kobozev. Id. at 295:15-296:11. Tatarin told the men that they had buried the body in too shallow a grave, and advised them to move the body and rebury it in a grave at least two meters deep. Id. at 296:12-18. Over the next year, Nosov, Spitchenko, Ermichine, and Gozman twice attempted to dig a second grave to rebury the body, but were unsuccessful. Id. at 299:11-300:2.

4

On March 29, 1999, more than three years later, Kobozev's skeletal remains were exhumed from the backyard of the Livingston house.  Trial Tr. IV: Donna Fontana ("Fontana") at 430:11-431:7, 433:16-434:10.  The pathology report concluded that certain of Kobozev's vertebrae were fractured prior to decomposition.  Id. at 441:6-22; see also Exhibits for § 2255 ("§ 2255 Exhibits") Ex. D (Forensic Anthropological Analysis of Donna M. Fontana, dated April 7, 1999 ("Fontana Report")) (Doc. No. 18).  No bullets were recovered near or around the body.  Trial Tr. IV: Fontana at 443:1-3.

**B.  The Indictment**

On October 31, 2001, pursuant to a third superseding indictment, Ermichine was charged with the following crimes: two counts of racketeering arising from his participation in the Tatarin Brigade, 18 U.S.C. § 1962(c); one count of conspiracy to racketeer, 18 U.S.C. § 1962(d); one count of kidnapping in aid of racketeering, 18 U.S.C. § 1959(a)(1), (2); one count of murder in aid of racketeering, 18 U.S.C. § 1959(a)(1), (2); one count of conspiracy to kidnap, 18 U.S.C. § 1201(a)(1), (c); one count of kidnapping, 18 U.S.C. § 1201(a)(1), (2); and one count of using and carrying a firearm during the murder and kidnapping of Kobozev, 18 U.S.C. § 924(c), (2).  See Exhibits for § 2255 Ex. B (Indictment S3 00 Cr. 314 (RLC)) (Doc. No. 18); United States v. Nosov, 221 F. Supp. 2d 445, 447 (S.D.N.Y. 2002).

Although the Indictment named Nosov and Gozman as co-conspirators, id. at 447, Gozman was not tried, as he was a fugitive at the time of the trial.  See United States v. Nosov, 119 F. App'x 311, 313 n.1 (2d Cir. 2004) (summary order); Memorandum of Law of the United States of America in Opposition to Motion to Vacate, Set Aside, or Correct His Sentence ("Opp.

Mem. of Law"), at 2 n.1 (Doc. No. 80).[1]  On February 8, 2006, Gozman pled guilty before

Magistrate Judge Gabriel Gorenstein.  See § 2255 Exhibits Exs. F (Plea Allocution in Southern

District of New York ("S.D.N.Y. Plea"), dated Aug. 19, 2005), G (S.D.N.Y. Plea, dated Aug. 25,

2005), H (S.D.N.Y. Plea, dated Feb. 8, 2006).

### C.  Appointment of Counsel

The Court appointed Daniel Nobel ("Nobel") to represent Ermichine, subsequent to his

indictment, under the Criminal Justice Act of 1964, 18 U.S.C. § 3006A ("CJA").  § 2255

Exhibits Ex. A (Transcript, dated Nov. 5, 2001) at 7:21-24.  However, because the offenses

alleged in the indictment provided for a possible sentence of death, the Court also appointed

Valerie Amsterdam ("Amsterdam") to act as death penalty co-counsel to Nobel, pursuant to 18

U.S.C. § 3005.[2]  Id. at 5:21-6:24, 6:3-22, 7:23-8:4; see also § 2255 Exhibits Ex. C (Affidavit of

Vasiliy Ermichine, dated Nov. 30, 2009 ("Ermichine Aff.")), ¶¶ 2-5.  At a November 5, 2001

conference, the Government clarified that it would not seek the death penalty against the

defendants.  § 2255 Exhibits Ex. A at 5:21-6:24.

At the conference, Ermichine requested, apparently for the first time, that the Court

replace Nobel as his court-appointed attorney, citing differences with Nobel as to whether he

---

[1] The Government's memorandum is docketed in the underlying criminal case as entry
number 80.

[2] Section 3005 of Title 18 of the United States Code provides, in part:

> Whoever is indicted for treason or other capital crime shall be allowed
> to make his full defense by counsel; and the court before which the
> defendant is to be tried, or a judge thereof, shall promptly, upon the
> defendant's request, assign 2 such counsel, of whom at least 1 shall be
> learned in the law applicable to capital cases, and who shall have free
> access to the accused at all reasonable hours. (emphasis added).

6

should accept a plea agreement. Id. at 7:21-9:7. Judge Carter explained that because the

September 17, 2001 trial date had been delayed due to the events of September 11, 2001, a

further adjournment to appoint new counsel would not be possible. Id. at 9:8-16. Nonetheless,

Judge Carter considered whether Amsterdam's firm was prepared to represent Ermichine on

November 13, 2001, the date jury selection would begin. Id. at 9:17-22. Attorney James

Branden, appearing on behalf of Amsterdam, stated that a scheduling conflict prevented either

him or Amsterdam from proceeding to trial until January 2002. Id. at 9:23-10:2. Accordingly,

Judge Carter denied Ermichine's application, and Nobel confirmed that he was prepared to

proceed to trial on November 13. Id. at 10:3-9.

### D. The Verdict

On December 5, 2001, Ermichine and Nosov were convicted of two counts of

racketeering, and one count each of kidnapping in aid of racketeering, murder in aid of

racketeering, and conspiracy to kidnap. Trial Transcript Volume XII ("Trial Tr. XII"): Verdict at

986:2-987:22. Both men were acquitted of the substantive kidnapping and firearm charges. Id.

at 987:23-988:5. On June 10, 2003, Ermichine was sentenced to concurrent life terms of

imprisonment on each count. Pet. at 1.

## III.   PROCEDURAL HISTORY

### A. Post-Verdict Appeal

Ermichine moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal

Procedure, raising two arguments: (1) the district court improperly curtailed cross-examination

of Spitchenko, in violation of the Sixth Amendment right of confrontation and Rules 607 and

608 of the Federal Rules of Evidence; and (2) the district court's ex parte communications with

certain jurors during the course of deliberations violated his right to be present for all stages of

the trial, also in violation of the Sixth Amendment.  Nosov, 221 F. Supp. 2d at 446.  On

September 17, 2002, Judge Carter denied Ermichine's motion for a new trial, finding both

arguments to be without merit.  Id. at 451, 456.

### B.   Direct Appeal

In addition to the claims rejected by Judge Carter, Ermichine raised two additional claims

on appeal.  First, he challenged the sufficiency of the evidence presented at trial.  Nosov, 119 F.

App'x at 314.  Second, he argued that "his trial counsel was per se ineffective because he did

not, following notice that the government would not seek the death penalty against him, receive

additional court-appointed representation by 'learned counsel'" pursuant to 18 U.S.C. § 3005.

Id. at 313.

The Second Circuit rejected each argument, and in a summary order affirmed Ermichine's

conviction.  With respect to the ineffective assistance of trial counsel claim, the Circuit noted

that Ermichine was "not assert[ing] that trial counsel was himself ineffective for failing to raise

this issue, but rather simply that the fact that [Ermichine] was represented only by a single

attorney at trial constituted per se ineffective assistance."  Id. at 315.  The Circuit found that

because Ermichine failed to raise an objection before the trial court, and "in light of the unsettled

state of the law on this matter, the court's actions were not plainly erroneous."  Id.

In addition, the Circuit found that the evidence was sufficient to sustain Ermichine's

conviction.  Id.  The Circuit also ruled that while the trial court had abused its discretion when it

determined to meet ex parte with jurors without first consulting counsel, this error was harmless.

Id. at 314.  Finally, the Circuit ruled that the trial court's limitation of cross-examination at trial

did not constitute an abuse of discretion.  Id. at 313.

8

On October 3, 2005, the Supreme Court denied certiorari.  Nosov v. United States, 546

U.S. 903 (2005).

## C.   The Instant Petition

On October 23, 2006, Ermichine, then proceeding pro se, filed the Petition, raising two

substantive arguments.[3]  First, Ermichine contends that the trial court violated his Sixth

Amendment right to trial counsel of his choice.  Pet. at 5.  Second, he claims that his trial

attorney was "ineffective for failing to challenge the multiplicitous nature of [the] Indictment."

Pet. at 6.

On September 25, 2009—almost three years after filing the Petition—Ermichine filed a

motion to amend the Petition on the grounds that the testimony that Gozman gave in a state

criminal trial in July 2007 constitutes "newly discovered evidence" regarding the Kobozev

kidnapping and murder.  See Request to Amend Petitioner's Motion to Vacate, Set Aside or

Correct His Sentence, dated September 22, 2009 ("Motion to Amend"), at 2 (Doc. No. 6).  More

specifically, Ermichine claims that Gozman's testimony "reveals a different set of facts as to

where Kobozev was murdered in contrast to the theory the Government proffered to the jury at

trial."  Id.

On November 13, 2009, the Government filed its opposition papers, arguing that (1) the

---

[3] The Petition was stamped "Received by the Pro Se Office on September 29, 2006" and was filed on the Court's docket on October 23, 2006.  However, because Ermichine was representing himself pro se at the time he filed the Petition, he benefits from the "prison mailbox rule," which provides that a petition for writ of habeas corpus is deemed filed on the day it is handed to prison officials for mailing.  Houston v. Lack, 487 U.S. 266, 276 (1988); Noble v. Kelly, 246 F.3d 93, 97-98 (2d Cir. 2001).  In this case, Ermichine signed and dated the habeas corpus petition September 24, 2006 (Doc. No. 1), so I will assume for purposes of this Report and Recommendation that this is the date that he handed the Petition to prison officials for mailing, thus making it timely under the applicable one-year filing requirement.  See 28 U.S.C. § 2255.

Sixth Amendment claim is procedurally defaulted, and otherwise meritless; (2) the ineffective assistance of counsel claim is meritless because the counts in the Indictment are not multiplicitous; and (3) the Motion to Amend is untimely and otherwise without merit.

On August 23, 2010, Ermichine, now represented by counsel, filed reply papers. See Petitioner's Reply to the Government's Memorandum of Law ("Reply Mem. of Law") (Doc. No. 15). On November 23, 2010, Ermichine filed a document, unsigned by counsel, entitled "Motion Requesting Judicial Notice Be Taken Pursuant to Federal Rule of Evidence 201" (hereinafter, the "Judicial Notice Motion") (Doc. No. 17). The document advances legal arguments regarding "newly discovered evidence," and attaches Gozman's plea allocution in this Court, and his testimony in New York State Supreme Court, Kings County, in the criminal case New York v. Krivoy and Ivantisky, Indictment No. 1634106. Id. at 1-3.

Finally, on February 8, 2011, Ermichine filed a document entitled "Exhibits to § 2255." (Doc. No. 18). This submission is comprised of a supplemental memorandum of law, and the documents referenced in the Judicial Notice Motion, among others.

## IV.   DISCUSSION

### A.   Standard of Review

To obtain relief under 28 U.S.C. § 2255, a prisoner in federal custody must show that his sentence: "(1) was imposed in violation of the U.S. Constitution or the laws of the United States; or (2) was entered by a court without jurisdiction to impose the sentence; (3) exceeded the maximum detention authorized by law; or (4) is otherwise subject to collateral attack." 28 U.S.C. § 2255(b). Collateral relief is available only for a constitutional error "that constitutes 'a fundamental defect which inherently results in a complete miscarriage of justice.'" United States v. Bokun, 73 F.3d 8, 12 (2d Cir. 1995) (quoting Hill v. United States, 368 U.S. 424, 428 (1962)).

10

As the Circuit has explained, "[t]he reasons for narrowly limiting the relief permitted under §

2255—a respect for the finality of criminal sentences, the efficient allocation of judicial

resources, and an aversion to retrying issues years after the underlying events took place—are

'well known and basic to our adversary system of justice.'"  Bokun, 73 F.3d at 12 (quoting

United States v. Addonizio, 442 U.S. 178, 184 & n.11 (1979)).

### B.  Denial of Right to Counsel of Choice Claim

Ermichine argues that the district court violated his right to counsel by failing to replace

Nobel, his court-appointed attorney, with Amsterdam, in violation of the Sixth Amendment.  Pet.

at 5.  This claim fails because it is procedurally defaulted and, in any event, without merit.

On direct appeal, Ermichine argued that he was entitled to additional counsel, pursuant to

18 U.S.C. § 3005.  Nosov, 119 F. App'x  at 314-15.  He now raises a different claim—that the

trial court should have substituted Amsterdam for Nobel as his trial counsel.  It is black letter law

that a claim not raised on direct appeal is procedurally barred in a habeas petition, unless the

petitioner can demonstrate both cause and prejudice, or that he is actually innocent of the crimes

of which he was convicted.  Bousley v. United States, 523 U.S. 614, 622-23 (1998); Zhang v.

United States, 506 F.3d 162, 166 (2d Cir. 2007).[4]

The Supreme Court has made clear that "cause" is measured against a heightened

standard of diligence.  See, e.g., Coleman v. Thompson, 501 U.S. 722, 753 (1991) ("[C]ause is

something external to the petitioner which cannot be fairly attributed to him and attorney

ignorance or inadvertence is not cause." (internal quotations and alterations omitted)).  To

establish prejudice, the petitioner must demonstrate that "the degree of prejudice" resulting from

---

[4] The Supreme Court in Bousley explained further that "'actual innocence' means factual innocence, not mere legal insufficiency."  523 U.S. at 623.

the error "infected the entire trial [such] that the resulting conviction violates due process."

United States v. Frady, 456 U.S. 152, 169 (1982).  To establish actual innocence, a petitioner

must demonstrate that "'it is more likely than not that no reasonable juror would have convicted

him.'"  Bousley, 523 U.S. at 623 (quoting Schlup v. Delo, 513 U.S. 298, 327 (1995)).

     The Second Circuit has recognized an additional exception to the procedural default rule

"where the issues were not raised at all on direct appeal due to ineffective assistance of counsel."

Underwood v. United States, 15 F.3d 16, 18 (2d Cir. 1993) (citation omitted).   This is the

exception that Ermichine attempts to invoke here.  He acknowledges that the denial of counsel

claim was not raised on direct appeal, but assigns blame to his appellate counsel for failing to do

so.  See Pet. at 11 ("The issues raised in grounds one and two have not been previously presented

in any court . . ."); Reply Mem. of Law at 8.

     An ineffective assistance of counsel claim is analyzed under the framework established

by the Supreme Court in Strickland v. Washington, 466 U.S. 668 (1984).  To prove such a claim,

a petitioner must demonstrate that (1) counsel's performance was deficient, and (2) the defendant

was prejudiced as a result of the deficient performance.  Id. at 687; see also Wiggins v. Smith,

539 U.S. 510, 521 (2003); Smith v. Robbins, 528 U.S. 259, 285 (2000).

     Under the first Strickland prong, the reviewing court "must indulge a strong presumption

that counsel's conduct falls within the wide range of reasonable professional assistance."

Strickland, 466 U.S. at 689.  The Supreme Court has also explained that "it is still possible to

bring a Strickland claim based on [appellate] counsel's failure to raise a particular claim, but it is

difficult to demonstrate that counsel was incompetent. . . . Generally, only when ignored issues

are clearly stronger than those presented, will the presumption of effective assistance of counsel

be overcome."  Smith, 528 U.S. at 288 (internal citation omitted); see also United States v. Kirsh,

12

54 F.3d 1062, 1071 (2d Cir. 1995) ("[F]ailure to make a meritless argument does not rise to the level of ineffective assistance.").

Under the second prong of Strickland, the petitioner must demonstrate prejudice. Id. at 694; Gueits v. Kirkpatrick 612 F.3d 118, 122 (2d Cir. 2010). This requires the court to examine "whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." Lockhart v. Fretwell, 506 U.S. 364, 372 (1993). Critically, the petitioner must show a "reasonable probability" that, but for the deficiency, "the result of the proceeding would have been different." Strickland 466 U.S. at 694. Accordingly, "[t]o establish prejudice in the appellate context, a petitioner must demonstrate that there was a reasonable probability that his claim would have been successful" before the state's highest court. Mayo v. Henderson, 13 F.3d 528, 534 (2d Cir. 1994). (citation and internal quotations omitted). "[T]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." Strickland, 466 U.S. at 697.

Ermichine's ineffective assistance of counsel claim thus survives only if his underlying claim—that he was deprived of his Sixth Amendment right to trial counsel of his choice—is meritorious. See, e.g., Santiago v. United States, No. 02 Civ. 5604 (RMB), 2003 WL 22966282, at *4 (S.D.N.Y. Dec. 16, 2003) (ineffective assistance of counsel claim failed where underlying claim meritless).

Ermichine relies on United States v. Gonzalez-Lopez, 548 U.S. 140 (2006), in support of his contention that he was deprived of his right to trial counsel of his choice. See Supplemental Memorandum of Law at 4-5, appended to § 2255 Exhibits (Doc. No. 18). But Ermichine's reliance on Gonzalez-Lopez is misplaced. As an initial matter, the Supreme Court distinguished

13

cases with privately retained attorneys from situations involving court-appointed counsel. <u>Id.</u> at 151 ("[T]he right to counsel of choice does not extend to defendants who require counsel to be appointed for them."); <u>see also</u> <u>United States v. Parker</u>, 469 F.3d 57, 62 (2d Cir. 2006) ("[A]n indigent defendant is not entitled to counsel of his or her choosing."). In other words, an indigent defendant, such as Ermichine, who is appointed counsel is not entitled to choose his own attorney.

Moreover, the Supreme Court observed that a trial court has "wide latitude in balancing the right to counsel of choice against the demands of its calendar." <u>Gonzalez-Lopez</u>, 548 U.S. at 152. Such a ruling will not be disturbed unless clear abuse is shown; to make that showing, the complaining party must establish both that the denial of the adjournment was arbitrary, and that it substantially impaired the presentation of his case. <u>Sequa Corp. v. GBJ Corp.</u>, 156 F.3d 136, 147-48 (2d Cir. 1998); <u>see also</u> <u>Morris v. Slappy</u>, 461 U.S. 1, 11-12 (1983) ("[B]road discretion must be granted trial courts on matters of continuances; only an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay violates the right to the assistance of counsel.") (internal quotation marks and citation omitted)).

Here, Ermichine requested new counsel one week before the commencement of trial because he was unhappy with Nobel, who had represented him for three years. § 2255 Exhibits, Ex. A at 7:21-9:7. Ermichine, in essence, sought a continuance until such time as Amsterdam, or another newly-appointed attorney, became available to substitute for Nobel as lead counsel. Thus, granting Ermichine's request would have necessitated an adjournment of the trial date. It was within the trial court's discretion to deny the appointment of new counsel made near the time of trial, particularly since Ermichine was represented by competent, prepared counsel. <u>See, e.g.</u>, <u>United States v. Konstantin</u>, 280 F. App'x 54, at *1 (2d Cir. 2008) (summary order)

14

(affirming denial of adjournment to appoint new counsel where defendant "displeased with his current counsel" made request one week before trial); United States v. Brumer, 528 F.3d 157, 160-61 (2d Cir. 2008) (affirming denial of application to replace counsel due to "delay and inefficiency that might ensue," and where district court concerned "new lawyer would seek to extend the briefing schedule").

In addition, the Government conceded in Gonzalez-Lopez that the trial court erroneously deprived the defendant of his right to counsel of his choosing. 548 U.S. at 144. Accordingly, the sole legal issue before the Court there was what level of prejudice, if any, must be shown once it is determined that an erroneous deprivation of counsel has occurred. Id. at 144-45. The Government makes no such concession here. See Opp. Mem. of Law at 14-20.

Consequently, under prevailing professional norms, it was perfectly reasonable for Ermichine's appellate counsel to winnow out Ermichine's meritless choice of counsel argument on appeal. See Jones v. Barnes, 463 U.S. 745, 751, 752 (1983). Ermichine is thus unable to overcome his procedural default by establishing that his appellate counsel was ineffective. Moreover, as discussed above, even if Ermichine's claim were not procedurally defaulted, it would fail on the merits since as a matter of law an indigent defendant cannot choose his own counsel.

### C.   Ineffective Assistance of Counsel Claim

Ermichine argues separately that Nobel was ineffective for failing to challenge the multiplicitous nature of Counts One through Five of the Indictment. Pet. at 6; Reply Mem. of Law at 10-11. Multiplicity is the charging of a single offense in separate counts. United States v. Ansaldi, 372 F.3d 118, 124 (2d Cir. 2004) (citations omitted). The test for multiplicity is "whether each provision requires proof of an additional fact which the other does not."

15

Blockburger v. United States, 284 U.S. 299, 304 (1932). If so, the charges are not multiplicitous. Id. As a threshold matter, this claim is also procedurally barred because it was not raised on direct appeal, and Ermichine cannot establish cause, prejudice, or as discussed infra actual innocence. Moreover, applying the first Strickland prong, I conclude that counsel's performance was not deficient because the charges in the Indictment were not multiplicitous.

Ermichine was charged with, and convicted of, being a member of and participating in the Brigade, in violation of 18 U.S.C. § 1962(c) (Count One); conspiring to racketeer, in violation of 18 U.S.C. 1962(d) (Count Two); kidnapping Kobozev in aid of racketeering, in violation of 18 U.S.C. § 1959(b)(1) (Count Three); murdering Kobozev in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(1) & (2) (Count Four); and conspiring to kidnap Kobozev, in violation of 18 U.S.C. § 1202(a)(1) and (c) (Count Five). § 2255 Exhibits Ex. B. The crimes for which Ermichine was convicted satisfy the Blockburger test because each requires proof of an additional fact or element that the others do not. 284 U.S. at 304.[5]

First, a conspiracy charge is not multiplicitous of the underlying substantive offense alleged in the indictment. See Ansaldi, 372 F.3d at 124 ("A conspiracy is not the same crime as the underlying violation that it contemplates."); see also Lopez v. United States, No. 04 Civ. 0866 (DGT), 2009 WL 1312899, at *6 (E.D.N.Y. May 11, 2009) (purpose for penalizing conspiracy and substantive offenses separately is to deter criminal organizations) (citation omitted)). Thus, the crime of conspiracy meets the test set forth in Blockburger. That is, conspiracy requires proof of an agreement, while the underlying offenses—in this case

_____

[5] The substantive kidnapping charge and the weapons charge are not addressed, since Ermichine was acquitted of those crimes. Trial Tr. XII: Verdict at 990:5-12.

16

kidnapping and racketeering—do not.  See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1191 (2d Cir. 1989) ("The gist of conspiracy is, of course, agreement.").

For this reason, Counts Three (kidnapping in aid of racketeering)[6] and Five (conspiracy to kidnap)[7] are not multiplicitous, as each required that the Government establish distinct elements.  Indeed, the factual predicate for Count Three was that Nosov, Gozman, and Ermichine kidnapped Kobozev "for the purpose of gaining entrance to and maintaining and increasing their positions in the Brigade," § 2255 Exhibits Ex. B, at 11-12, while the factual predicate for Count Five was that the defendants "conspired, confederated, and agreed together" to kidnap Kobozev. Id. at 13.

Similarly, Counts One (racketeering)[8] and Two (conspiracy to racketeer)[9] are not multiplicitous.   Count One alleges that Ermichine engaged in "a pattern of racketeering activity"

---

[6] The elements of kidnapping in aid of racketeering are: (1) the existence of an enterprise affecting interstate or foreign commerce; (2) that the enterprise engaged in racketeering activity; (3) that the defendant had (or sought) a position in the enterprise; and (4) the commission of a kidnapping (5) to maintain or increase the defendant's position in the enterprise.  Leonard B. Sand, et al., 2 Modern Federal Jury Instructions – Criminal, at § 52.07 (2010) ("Sand").

[7] The elements of conspiracy to kidnap are: (1) an agreement between two or more persons to kidnap; (2) that the defendant knowingly and willfully became a member of the conspiracy; and (3) at least one member of the conspiracy knowingly committed at least one overt act charged in the indictment (4) to further the object of the conspiracy. 1 Sand, at § 19.3.

[8] The elements of racketeering are: (1) the existence of an enterprise (2) affecting interstate or foreign commerce; (3) that the defendant was associated with or employed by the enterprise, and (4) engaged in a pattern of racketeering activity; and (5) the defendant conducted or participated in the conduct of the enterprise through a pattern of racketeering activity.  2 Sand, at § 52.04.

[9] The elements of conspiracy to racketeer are: (1) the existence of an enterprise (2) affecting interstate or foreign commerce; (3) that the defendant was associated with or employed by the enterprise, and (4) knowingly and willfully became a member of the conspiracy to conduct and participate in the conduct of the affairs of the enterprise. 2 Sand, at § 52.05.

17

by committing several over acts, including kidnapping, extortion, and murder, id. at 5-9, while Count Two alleges that he "agreed that a conspirator would commit at least two acts of racketeering." Id. at 10.  See United States v. Basciano, 599 F.3d 184, 198 (2d Cir. 2010) ("[T]his Court has long recognized that a defendant may be prosecuted both for substantive racketeering in violation of § 1962(c) and for the commission of violent crimes in aid of racketeering in violation of § 1959(a)(1)-(3).").

Finally, Count Four (murder in aid of racketeering)[10] is not multiplicitous of the other offenses, as it required the Government to prove that the defendant committed murder, an element not required by the other offenses.  In that vein, as noted in footnotes 6-10 below, each offense includes an element entirely distinct from the other four: racketeering requires proof that the defendant engaged in a pattern of racketeering activity; conspiracy to racketeer requires proof of an agreement among two or more persons to participate in the conduct of the enterprise; kidnapping in aid of racketeering requires proof that the offense was conducted to maintain or increase the defendant's position in the enterprise; and conspiracy to kidnap requires an agreement among two or more persons to kidnap.

In light of this analysis, trial counsel's failure to challenge the so-called multiplicitous nature of the Indictment does not give rise to a Sixth Amendment violation, as the objection would have been meritless.  Kirsh, 54 F.3d at 1071. Thus, Ermichine's ineffective assistance of counsel claim fails.

### D. Actual Innocence Claim

---

[10] The elements of murder in aid of racketeering area are: (1) the existence of an enterprise affecting interstate commerce; (2) that the enterprise engaged in racketeering activity; (3) the defendant had (or sought) a position in the enterprise; (4) that the defendant committed murder; (5) to maintain or increase his position in the enterprise. 2 Sand, at § 52.07.

Ermichine asserts that the purported new evidence he has presented in support of his actual innocence claim "certainly would have changed the outcome of the case." Reply Mem. of Law at 6. The Government objects to the claim as untimely, procedurally defaulted, and meritless. Opp. Mem. of Law at 28.

As an initial matter, the actual innocence claim—presented for the first time in the Motion to Amend—is time barred. Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a habeas petition is subject to a one-year statute of limitations. Section 2255 provides, in relevant part:

> (f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> (1) the date on which the judgment of conviction becomes final;
>
> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
>
> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. 2255(f). A criminal conviction becomes final 90 days after the Second Circuit's affirmation of the conviction if the defendant does not seek further review from the Supreme Court, or 90 days after the Supreme Court denies certiorari. Clay v. United States, 537 U.S. 522, 532 (2003).

Ermichine's conviction became final on January 3, 2006, 90 days after the Supreme Court denied certiorari. Pet. at 3. The Petition was filed on September 24, 2006, well within the

one-year statute of limitations.  Id. at 14.  However, the Motion to Amend was not filed until

September 25, 2009, more than three years later.  Ermichine acknowledges the untimeliness of

the Motion to Amend, but nonetheless contends that the amendment "relates back" to the

Petition.  Reply Mem. of Law at 2.

### 1.   The Amendment Does Not Relate Back to the Petition

An amendment to a habeas petition filed after the expiration of the statute of limitations

is barred unless it "relates back" to the original petition under Rule 15(c) of the Federal Rules of

Civil Procedure.  Mayle v. Felix, 545 U.S. 644, 655 (2005); Slayton v. Am. Express Co., 460

F.3d 215, 228 (2d Cir. 2006) (proposed amendment relates back only when arising out of same

factual conduct forming basis of original pleading).  Rule 15(c) provides, in part, that "[a]n

amendment to a pleading relates back to the date of the original pleading when . . . the

amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set

out – or attempted to be set out – in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

In Mayle, the defendant appealed his murder and robbery convictions on the ground that

the admission of videotaped statements of a witness violated his Sixth Amendment right to

confront witnesses against him.  Id. at 648-49.  The intermediate appellate court affirmed the

conviction, and the state supreme court denied his petition for review.  Id. at 651.  The defendant

timely filed a petition for a writ of habeas corpus in federal district court.  Id.  Several months

after the expiration of the AEDPA statute of limitations, the defendant filed an amended petition,

asserting the additional claim that the trial court improperly admitted statements he made during

a police interrogation, in violation of the Fifth Amendment.  Id. at 651-52.

The defendant argued that his Fifth Amendment claim related back to his Sixth

Amendment claim because both claims challenged the constitutionality of the same conviction.

20

Id. at 652. The Supreme Court disagreed, and clarified that "relation back depends on the

existence of a common 'core of operative facts' uniting the original and newly asserted claims."

Id. at 659 (citations omitted). The Court held that the claims were not united by a common core

of operative facts, because each claim arose from events different in both time and place – the

videotaped interview of the witness, and the defendant's interrogation by police. Id. at 660-61.

The Supreme Court further explained that a trial is not a "transaction or occurrence" under Rule

15(c). Id.; see also Gibson v. Artus, No. 08-1576, 2010 WL 4342198, at *1-2 (2d Cir. Nov. 3,

2010) (summary order) (amended petition alleging ineffective assistance of trial counsel

regarding grand jury proceedings unrelated to original petition alleging ineffective assistance of

trial counsel regarding failure to raise speedy trial objection and failure to challenge indictment);

Freeman v. United States, Nos. 09 Civ. 4087 (LAP), 02 Cr. 150 (LAP), 2010 WL 4026067, at

*3-4 (S.D.N.Y. Oct. 14, 2010) (amended petition alleging multiplicitous indictment unrelated to

petition asserting defective indictment).

      Ermichine fails to explain, in non-conclusory terms, how his "actual innocence" claim

relates back to the claims in the Petition. That is because it does not. As in Mayle, the amended

claim and the claims asserted in the Petition do not arise from a "common core of operative

facts." Mayle, 545 U.S. at 664. As previously discussed, the Petition asserts denial of counsel of

choice and ineffective assistance of counsel claims in violation of the Sixth Amendment. The

Motion to Amend, on the other hand, asserts that Gozman's 2006 plea in this Court, and his 2007

testimony in state court, prove that Ermichine did not murder Kobozev. There are no facts or

statements alleged in the Petition to which the actual innocence claim can relate back. Mayle,

545 U.S. at 649. The amended claim clearly "'asserts a new ground for relief supported by facts

that differ in both time and type,' from a claim of [denial of counsel] or ineffective assistance of

counsel." Soler v. United States, Nos. 10 Civ. 4342 (RJH) (MHD), 05 Cr. 00165 (RJH), 2010 WL 5173858, at *4 (S.D.N.Y. Dec. 20, 2010) (amended claim of actual innocence unrelated to ineffective assistance of counsel claim asserted in original petition).

Moreover, because the amended claim is unrelated to the claims asserted in the Petition, Ermichine did not provide the Government with fair notice that he intended to challenge the sufficiency of the evidence presented at trial. See Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 815 (2d Cir. 2000); Freeman, 2010 WL 4026067, at *2 (citing Baldwin Cnty. Welcome Ctr. v. Brown, 466 U.S. 147, 149 n.3 (1984)). As discussed in Mayles, the relation back doctrine does not apply merely because the proposed claim arises from the same trial, conviction, or sentence. 545 U.S. at 660-61.[11]

## 2. Gozman's Testimony Is Not Newly Discovered Evidence

As an alternative basis for finding the amended claim to be timely, Ermichine argues that January 2009 was "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4); Reply Mem. of Law at 7. Specifically, Ermichine contends that in January 2009 he received "from an attorney" a copy of Gozman's testimony and plea allocution. § 2255 Exhibits Ex. C (Ermichine Aff.) at ¶ 14. I find this argument unpersuasive.

Under section 2255(f)(4), the one-year statute of limitations begins to run from the time a reasonably diligent prisoner in the petitioner's circumstances would have discovered the facts giving rise to his claim. Wims v. United States, 225 F.3d 186, 188-89 (2d Cir. 2000). The critical inquiry is when the facts supporting the underlying claim – here, actual innocence –

---

[11] Ermichine does not argue that equitable tolling applies in his case, and that issue is thus foreclosed. See Gibson, 2010 WL 4342188, at *1; Freeman, 2010 WL 4026067, at *4.

could have been discovered; not when such facts were actually discovered.  See Gonzalez-Ramos v. United States, No. 05 Civ. 3974, 99-CR-1112 (LAP), 2007 WL 1288634, at *7 (S.D.N.Y. May 2, 2007).  In other words, the Court must consider the date on which Ermichine had notice of the facts supporting the claim, not the date on which he possessed the evidence supporting the claim.  Reyes v. Mance, No. 09 Civ. 2066 (CM), 2010 WL 1737806, at *6 (S.D.N.Y. Apr. 23, 2010).

Ermichine could have discovered Gozman's plea allocution and trial court testimony sooner with reasonable diligence.  Gozman pled guilty to the counts in the Indictment, including Kobozev's murder and kidnapping, on August 19, 2005, August 25, 2005, and February 8, 2006 – at least eight months before the Petition was filed.  § 2255 Exhibits Exs. F-H.  See Williams v. Breslin, No. 03 Civ. 1848 (RWS), 2004 WL 2368011, at * 7 (S.D.N.Y. Oct. 20, 2004) (no tolling where "all of the acts and omissions alleged concern events that transpired before the one-year limitations period under the AEDPA had begun to run").  It is unlikely that Ermichine, even while imprisoned, did not know prior to January 2009 that Gozman had pled guilty in this very Court.  What Ermichine may not have been able to determine was whether the allocution had legal implications for him until he received the plea allocution and testimony in January 2009.  But belated discovery of the legal significance of facts is "not a factual matter but rather a matter of law" precluding a delay in the commencement of the AEDPA one-year statute of limitations.  Murphy v. Strack, 9 F. App'x 71, 73 (2d Cir. 2001) (summary order).  Similarly, although Gozman testified in state court several months after the expiration of the AEDPA one-year statute of limitations (January 3, 2007), Ermichine could have discovered that fact prior to September 25, 2009, when he filed the Motion to Amend.  Notably, Ermichine does not explain why it took him nine months even after receiving this information to amend his Petition.  In any

23

case, as discussed below, even if discovery of the allegedly new evidence was considered to be timely, it would not have changed the outcome of the trial.

### 3. Ermichine's Actual Innocence Claim Is Meritless

Ermichine contends that Gozman's July 2007 trial court testimony that Kobozev died in the car on the way to New Jersey, and his August 2005 plea allocution stating that Kobozev "died in Brooklyn, not in New Jersey," undermines Spitchenko's testimony that Ermichine broke Kobozev's neck, and therefore Ermichine is actually innocent of the crimes for which he was convicted.  Motion to Amend at 24-25; § 2255 Motion Exs. H, at 30:10-13, 33:18-25 & I at 212:6-7.  Ermichine attempts to anchor this actual innocence claim in a purported Brady violation, contending that Gozman's plea allocution and testimony constituted exculpatory information that the Government failed to produce to him years after his 2001 conviction.  See Reply Mem. of Law at 22 (citing Brady v. Maryland, 373 U.S. 83, 87 (1963)).  Ermichine's actual innocence claim is without merit.

As an initial matter, Brady is inapplicable here.  The Supreme Court has explained that the prosecutorial duty to disclose exculpatory evidence under Brady is a "preconviction trial right" that does not apply post-conviction or to post-conviction proceedings such as those Ermichine has initiated here.  See Dist. Attorney's Office for Third Judicial Dist. v. Osborne, 129 S. Ct. 2308, 2320 (2009) (rejecting the Ninth Circuit's application of Brady as a post-conviction right and concluding, in § 1983 action, that "Brady is the wrong framework" for determining whether a state's post-conviction relief procedures satisfy due process); Skinner v. Switzer, 131 S. Ct. 1289, 1300 (2011) (explaining that "Brady announced a constitutional requirement addressed first and foremost to the prosecution's conduct pretrial" (emphasis added)); cf. Herrera v. Collins, 506 U.S. 390, 399 (1993) (listing habeas petitioner's right to exculpatory evidence

24

under Brady as one of the constitutional provisions that ensures "against the risk of convicting an innocent" and explaining that "[o]nce a defendant has been afforded a fair trial and convicted of the offense for which he was charged, the presumption of innocence disappears"). Accordingly, even if Gozman's allocution and testimony did contain exculpatory information—which they do not—the Government had no Brady obligation to produce such information to Ermichine years after his conviction. Ermichine's claim of actual innocence is therefore freestanding and not rooted in any "independent constitutional violation." See Herrera, 506 U.S. at 402; see also Chin v. United States, No. 08 Civ.1735 (FB), 2009 WL 3380725, at *4 (E.D.N.Y. Oct. 19, 2009) (explaining that a "freestanding" actual innocence claim is "one not based on any constitutional infirmity at trial other than the conviction of an innocent person.").

The Government, relying on Herrera, argues that such freestanding actual innocence claims are not legally cognizable in a habeas petition arising from a federal conviction. Opp. Mem. of Law at 32. Though the Herrera Court stated in dicta that "claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation," 506 U.S. at 400, it did not decide the issue and merely assumed that such a ground for habeas relief existed for the sake of argument, id. at 417. The issue remains open today.

Indeed, the Supreme Court recently stressed that it has not resolved the issue of whether a freestanding right to be released upon proof of actual innocence exists. See Osborne, 129 S. Ct. at 2321-22. In Osborne, the Supreme Court explained that "[w]hether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, arguendo, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." Id. at 2321 (citations omitted). The Supreme

25

Court's statement regarding the "high standard" a claimant would have to meet is particularly important here; it is one that the Supreme Court has also characterized as "'extraordinarily high,'" and "requir[ing] more convincing proof of innocence than Schlup." House v. Bell, 547 U.S. 518, 554-55 (2006) (quoting Herrera, 506 U.S. at 417) (concluding that although petitioner had gathered DNA and other forensic evidence that "cast considerable doubt on his guilt—doubt sufficient to satisfy [the] standard for obtaining federal review despite a state procedural default," his was "not a case of conclusive exoneration" and fell "short of the threshold implied in Herrera").

The Schlup standard "'does not require absolute certainty about the petitioner's guilt or innocence'; rather, '[a] petitioner's burden . . . is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.'" Id. at 538.   In light of these principles, it is thus no wonder then that one prominent commentator has plainly put it that "[t]he chances that such a claim will ever succeed are extremely small . . . ." Wayne R. LaFave, et al., 7 Criminal Procedure § 28.3(e) (3d ed. 2007).   Nevertheless, I now turn to the application of these principles to the facts here.

Even assuming, for argument's sake, that a freestanding actual innocence claim such as the one Ermichine asserts here is legally cognizable, Ermichine fails to offer any convincing proof of innocence that would enable him to meet even the Schlup standard—the theoretical floor of any such actual innocence claim—let alone that of Herrera.   In fact, Gozman's plea allocution and testimony corroborate much of Spitchenko's testimony regarding Kobozev's kidnapping and murder, beginning with the altercation at the Paradise:

26

THE DEFENDANT: Approximately in 1995, Nosov and a member of the brigade, they were having a fight in the club and Sergei Kob[o]zev was a bouncer working there.

******

THE DEFENDANT: Several days later, myself and Joseph and Ermichine were present at the garage in Brooklyn.  Nosov recognized Kob[o]zev, who was a bouncer at the club at the time that he was assaulted.  And the fight started with Kob[o]zev because of something [sic] happened before.

******

THE DEFENDANT: - - because of his involvement in the earlier assault on Nosov.  During this fight, Nosov shot Kob[o]zev.  Following the shooting, Kob[o]zev was still alive.  I assisted Nosov taking Kob[o]zev out of the garage and putting him into a car without his consent.  And we took Kob[o]zev out of the garage.

The decision was made to take Kob[o]zev to the house of another brigade member in New Jersey after he was confined in the car, and another member of the brigade killed Kob[o]zev.

§ 2255 Exhibits Ex. G, at 8:9-9:6.

Gozman repeated the same facts at his continued plea allocution, adding that he, Ermichine, and Nosov "decided to take Kob[o]zev's body to a house in New Jersey that belonged to another member of the Brigade to get rid of the body."  § 2255 Exhibits Ex. H, at 30:10-13.  Similarly, Gozman agreed during his continued plea allocution that he "understood that Vasiliy Ermichine intended to murder Sergei Kob[o]zev[.]"  § 2255 Exhibits Ex. F, at 21:19-21.

Gozman's 2007 state court testimony is equally damaging to Ermichine:

Q.    Let's talk about [Kobozev,] the boxer.

Did you have a dispute in a club in November, 1995?

******

27

A.      Yes.

Q.      What happened?

A.      Nosov and me were over there.  So we had a good time.

                              ******

Q.      Tell us what happened with Nosov and you.

A.      We had a good time in the restaurant and the band, the music
        band, and Nosov had a problem. So they wanted him to come to
        the back room.

Q.      Who wanted who to go to the back room?

        You have to say who the people are.

A.      He was in there.  He happened to be over there with the person
        who ran the restaurant by the name of Igor Roffman.

Q.      What was the name of the restaurant?

A.      Paradise.
                              ******

Q.      Did there come a time that you saw [Kobozev] after that
        incident?

A.      Yes. Nosov and me stopped by to shop and Vasili and the
        boxer[, Kobozev,] were over there.  Nosov told him that that
        was the boxer who was present back then at the restaurant.  So
        Vasili told him, let's talk with him.  We have to talk, and it's
        necessary to tell him that we remember everything.  We didn't
        forget a thing.  We went with him to the back room.  Vasili took
        the pistol and he put the pistol to his head.  [Kobozev]
        attempted just to get the pistol from Vasili.

                              ******

Q.       What happened after Nosov shot Sergei Kobozev?

                              ******

A.      We just put him in the car.  We got outside and we started to
        think what should we do next with him.

                              28

> Q.   Was he alive at the time that you helped those individuals put
> him in the car?
>
>                    ******
>
> A.    After, he was still alive back then.  We just were trying, we
> were thinking what should we do next with him and he started
> to implore us to deliver him to the hospital. Vasili just turned
> around and he started to hit him with the pistol.
>
> Q.   Then what happened to Sergei Kobozev?
>
> A.   Well, we delivered him to, we delivered him to Spitchenko.

§ 2255 Exhibits Ex. I, at 2120:15-2124:3.

Gozman's testimony regarding the precise location of Kobozev's death does not

exonerate Ermichine.  In any event, even if Kobozev had died in the car en route to New Jersey

and not at Spitchencko's home, this fact would not have altered the outcome of Ermichine's trial.

See Herrera, 506 U.S. at 418 (stating that new evidence "must be considered in light of the proof

of petitioner's guilt at trial").  It does not negate the fact that Ermichine, Nosov, and Gozman

together kidnapped and murdered Kobozev in an effort to elevate their status within the Brigade,

a criminal enterprise.[12]

Moreover, alternate theories with respect to Kobozev's death were tested at trial, and

failed.  Nosov's attorney cross-examined Spitchenko regarding an FBI interview in February

1999, where Spitchenko apparently stated that Kobozev was dead by the time Nosov, Ermichine,

---

[12] Count Four of the Indictment charged Ermichine with murder in aid of racketeering,
which required proving: (1) the existence of an enterprise affecting interstate commerce; (2) that
the enterprise was engaged in racketeering activity; (3) the defendant had (or was seeking) a
position with the enterprise; (4) the defendant committed murder; and (5) the general purpose for
committing the murder was to maintain or increase his position in the enterprise.  § 2255
Exhibits Ex. B; 2 Sand, at § 52.07.

and Gozman arrived at his house.  See Trial Tr. IV: Spitchenko at 257:18-24.  The jury clearly
was unpersuaded.

Finally, there is no reason why the Court should credit Gozman's testimony over that of
Spitchenko's.  Both men are convicted felons who have confessed to engaging in extortion,
kidnapping, robbery, and murder as part of a criminal enterprise.  Certainly Gozman, who fled
the country to escape trial in this Court, is no more credible than Spitchenko.

Accordingly, even if Ermichine's actual innocence claim were legally cognizable,
Ermichine has not demonstrated that, in light of the new evidence he has offered, it is more
likely than not any reasonable juror would have had reasonable doubt about his guilt.  See
House, 547 U.S. at 538.  His claim thus fails.

### 4.  An Evidentiary Hearing Is Not Required

Finally, Ermichine requests an evidentiary hearing on his claims.  Reply Mem. of Law at
24-26.  28 U.S.C. § 2255(b) provides that "[u]nless the motion and the files and records of the
case conclusively show that the prisoner is entitled to no relief, the court shall cause notice
thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine
the issues and make findings of fact and conclusions of law with respect thereto."

To warrant a hearing, a petitioner's "application must contain assertions of fact that [the]
petitioner is in a position to establish by competent evidence."  United States v. Aiello, 814 F.2d
109, 113 (2d Cir.1987); see also LoCascio v. United States, 395 F.3d 51, 57 (2d Cir. 2005).  The
court must then determine whether, viewing the record "in the light most favorable to the
petitioner, the petitioner, who has the burden, may be able to establish at a hearing a prima facie
case for relief."  Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).  If any material facts
are in dispute, and a petitioner can identify the available sources of the relevant evidence, a

30

petitioner's claims will warrant a hearing.  See id. at 213-14 (noting that "a petitioner may need only to identify available sources of relevant evidence rather than obtain it as in civil cases . . . ."). But "[a]iry generalities, conclusory assertions and hearsay statements will not suffice because none of these would be admissible evidence at a hearing." Aiello, 814 F.2d at 113-14. The Court is not required to presume the credibility of factual assertions "where the assertions are contradicted by the record in the underlying proceeding." Puglisi, 586 F.3d at 214.  Further, if it "plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Puglisi, 586 F.3d at 213 (citations omitted).

Ermichine contends that "in order to be entitled to an evidentiary hearing, a petitioner need only allege and not have to prove, reasonably specific, non-conclusory facts that, if true, would entitle him to relief." Reply Mem. of Law at 25.  But Ermichine alleges no such facts here and, in any event, fails to provide the Court with any credible evidence that he may be able to establish a prima facie case for relief.  All of the factual assertions Ermichine makes are in his various memoranda of law, and such "unsworn statements in a brief are not evidence.'" Puglisi, 586 F.3d at 217 (quoting Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009)).  In light of the foregoing discussion of the merits of Ermichine's claims and because the motion, the files, and records of the case conclusively show that Ermichine is entitled to no relief, no hearing is required here.

31

## V.   CONCLUSION

For the foregoing reasons, I recommend that the motions be DENIED.[13]  I further recommend that this Court decline to issue a certificate of appealability because there has been no "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); see United States v. Perez, 129 F.3d 255, 260 (2d Cir. 1997).

### PROCEDURE FOR FILING OBJECTIONS

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections.  See also Fed. R. Civ. P. 6.  Such objections, and any responses to such objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Loretta Preska and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, New York, New York, 10007.  Any requests for an extension of time for filing objections must be directed to Chief Judge Preska.  **FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW.**  See Thomas v. Arn, 474 U.S. 140 (1985); Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C., 596 F.3d 84, 92 (2d Cir. 2010) (citing Cephas v. Nash, 328 F.3d 98, 107 (2d Cir. 2003) and Mario v. P & C Food Mkts., Inc., 313 F.3d 758, 766 (2d Cir. 2002)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  If Petitioner does not have access to cases cited herein that are reported on LexisNexis or Westlaw, he should request copies from Respondent's counsel.  See Lebron v.

---

[13]  To the extent necessary, the Court should grant the Judicial Notice Motion (Doc. No. 17) in order for the record to be complete.  See United States v. Bari, 599 F.3d 176, 180 (2d Cir. 2010).

Sanders, 557 F.3d 76, 79 (2d Cir. 2009).

Dated: New York, New York
      May 12, 2011

                                         JAMES L. COTT
                                         United States Magistrate Judge

**Copies of this Report and Recommendation have been mailed to:**

Robert Douglas DiDio
80-02 Kew Gardens Road
Suite 1030
Kew Gardens, NY 11415

Ryan P. Poscablo
Assistant United States Attorney
One St. Andrew's Plaza
New York, New York 10007

Hon. Loretta A. Preska